This video is a derivative work of the New York Times. Any resemblance to persons, living or dead, is coincidental and unintentional. Next case is Nextpoint, Inc. v. Hewlett-Packard, 2016-23-12. Mr. Topek, is it? Thank you, Your Honor. May it please the Court, I'd like to start just briefly by describing what the problem was that this patent is getting at and what it did to solve that problem. The problem is you have a body of electronically stored information that would commonly, for example, be produced in discovery in a lawsuit. And you need to process that information and you want to do that in a cloud-based environment. And the question is how do you do that? I just want to make clear what it's not claiming. You're not saying that what's unique or patentable about this is putting it in a cloud-based environment, right? That's exactly right. We're saying that there's a specific way of going about doing that, which is to take that data, parse it, pull out the metadata, and divide it into the smallest block of information that makes sense based on what the function is that's going to be performed on it. So not to just, as opposed to what was teased out in the prosecution history, was prior art that said you just divide it in a static block. And so that's really what's different here. But assuming, for the sake of argument, that that really is different, that doing it document by document or page by page is somehow different, how is just making that done in a computational format or doing it on a computer, why does that add enough? Well, it is not saying process this ESI in some undisclosed way using a computer. It's saying have the computer go through the following steps to decide how to divide up the data and how to assign those processing tasks across the cloud. And that's what's different. So the only thing that would be missing is the actual code written that says, okay, this is how you actually do that. And I don't think we're at a point of saying that in a computer invention you have to actually list the code or that level of specificity in order to meet the requirement that you have basically a technical solution to a technical problem. I was a young associate sitting in warehouses going through boxes and I would decide whether or not we needed to base stamp something on a document by document basis or whether we needed to produce something as it was held in the normal course so it would be on a topic by topic basis. Why isn't that what's normally done by hand? Right, so for one there is a big difference between a large volume of electronically stored information and paper documents. And there's all kinds of case law and things that have evolved about ESI and what's expected in electronic discovery and how quickly it should happen and how you go about actually processing all that. And I think this is maybe something where the district court got a little bit turned around. We're not talking about what processing on the documents is being done. We're talking about how do you decide, how do you process that batch of information and divide out those processing tasks themselves to different computers. So it doesn't really lend itself to a real world analogy because you're talking about trying to process large volumes of information very quickly and doing that more quickly by putting it in the cloud where you're basically saying in real time very quickly as soon as you computer are ready for the next page, here's the next page or if it's something that needs to be processed on a document basis. As soon as you're done with this document, here's your next document. So this is not broad functional claiming of the sort of the many cases that have come before this court. It basically says here's a commercial idea or here is an economic principle and says go do it on the computer with a processor or with code. This actually in the claim says these are the steps that the host computer will perform in order to do that, in order to make that determination. And that's what's just fundamentally different from the cases in which you have found that there was not patentable subject matter. Does Amdocs help you at all? Yes. So I think that Amdocs does. The difference between this case and Amdocs is, as I read Amdocs, what you're saying is you have these known pieces but you're putting them together in a new particular structure. And what we're saying here isn't so much that it's a new particular structure, it's a new particular process that the computers use within that structure. And I don't think there's any appreciable difference between those two things because they're both getting at the same problem, which is we don't want to allow broad functional claiming of economic principles or commercial principles. We want there to be something technical. We want a technical solution to a technical problem. And that's exactly what you have here. You have the question of how does the computer actually go about doing that? How does it divide those tasks up and how does it give it to the different computers that are within the cloud? So I think that Amdoc does help, especially when you make that comparison. You object to the fact that there was no differentiation between Claim 1, which the court found to be representative, and the dependent claims. But you don't really say in your brief what about the dependent claims add something more or different than you feel is added by Claim 1. So what is it in the dependent claims? Well, I think one example is the bait stamping and by page example. So one of the complaints is, well, what does that mean? How do you know what the smallest block would be in any given instance? So it's then even going one step further and saying, well, for this process to be performed, this is the smallest block. So really then there's nothing left to do other than code that example, code that process. So I think that addresses it. There's also issues of preemption that HP has brought up. And throughout the dependent claims, you have various limitations on the types of computers and the types of architecture that would be used. So there is no record that says, well, all those things are known. This is all just sort of post hoc. There isn't anything new about any of that. This is on a motion to dismiss. But if we're talking about the dependent claims and you're talking about preemption, the dependent claims have to include what's in the independent claims. So if the independent claim preempts, then the dependent claims would similarly preempt. You just have additional limitations. Well, but if those additional limitations narrow the scope of the claims, then there is less that is being preempted. Because what is preempted is what the claims claim, not the broad ideas that are maybe set forth as background in the specification. It's the claims. We have to look at what the claims actually claim. So the more dependencies you put in, then the more things that aren't covered and the more alternative ways there are to do it. But preemption aside, looking at the claim limitations, which is what we have to do, it looks like it's handling information through breaking it into blocks. But it's information to information, data to data. Why isn't that abstract? It's not abstract because unlike claims that just say do that on a computer, it sets forth the technical process for how you go about dividing that information and how you allocate those tasks to the different computers that are within the cloud architecture. I think that's really the big fundamental difference here from claims that have been found to be ineligible, is you actually have process steps in the claims that are saying this is how you go about performing that. So we would have to go so far as to say if it involves data processing at all, it's ineligible. And there's no precedent that has gone that far. But aren't the steps abstract? Are the steps abstract? Yeah. So no, I don't believe the steps are abstract. It walks through... Which ones are not? I don't believe any of them are abstract. I think the dispute here has been centered around... Storing data? None of them are abstract? I think the central limitation that's at issue in the appeal is the third one. Dividing the electronically stored information into a plurality of blocks of information, where each said plurality of blocks of information comprises the smallest block of information to be processed at one time, depending on type of processing required. So that is not abstract. An abstract claim here would just be one that says process electronically stored information in the cloud, or using cloud computing. That would be broad functional claiming and it would be too abstract. And that's not what's happening in these claims. This is laying out the process of how you actually go about doing that. Another broader point that I think needs to be highlighted is the district court really discounted or overlooked the fact that the limitation that we're pointing to is saying this is why this is not abstract, this is why it's not conventional, is the very limitation that was argued in prosecution to distinguish the prior art. So you have a 12B6 motion, you have no evidence that's been presented, you have all the inferences that should be in favor of the patentee, and you have a prosecution history that points to the very limitation that we're relying on as the one that ultimately led to the issuance of the claims. And you have something that is a technical solution to a technical problem that coupled with the prosecution history, I don't think there's any real argument to say that that is not a technical solution or that it was conventional. If it was new enough to get the claims issued, then it doesn't make sense to say, well, but it was conventional. And I recognize that conventionality and novelty... computing, which I think your spec says, yeah, that was around. If you're going to distribute the computing on some large amount of information, you need to break it into pieces, let's call them blocks, and send the different pieces to different nodes on the network, different computers that are going to be doing the pieces. And you better send them a piece that is, or you can choose to send them, the smallest piece to be processed. And this only says comprises the smallest block of information, so it includes, it has to be at least that large. What's technical about, or what's the asserted advance in the technical aspect? It's as compared to the prior art that was cited in prosecution that said, you get all this data and you set a static size, and you say, we're going to just divide that information for processing based on a set number of bits, for example. As opposed to having that depend upon what the processing task is that's going to be performed. And what's in the record is that in prosecution. And so I think there's sort of a, there's maybe a fine line between when something you can safely say common sense would tell you it must work that way, versus saying, well, to a person of skill in the art in that field at that time, is that really true? Is it really such that this was conventional? And what sets this case largely apart from many others, I think, is that prosecution history, where that very issue was what was put before the patent office, and then the claims issued after that. And so I don't think there's a record by which you can conclude that that's something everybody would know to do, or that that was conventional. I'm actually into my rebuttal time a little bit. You are? So shall we save it for you, or do you want to continue? Yeah, I think I'll save it unless there's any other questions you want to address. All right. Mr. Shelton. Good morning, Your Honors. May it please the Court, Barry Shelton for all the appellees. This case falls squarely within what is now a well-worn groove that started with Alice and continues to a decision from this Court this very week on Tuesday. That would be the Intellectual Adventures 2 versus Capital One, which was authored by a presidential opinion by Chief Judge Prost. And that groove is – What about the dividing limitation here? Your Honor, that – Isn't that technical, as your opposing counsel says? It's not, Your Honor. And the reason why it's not is that, as Judge O'Malley referenced with regard to her early days as an associate, and probably just about everybody in this room, the notion that you – We've got the young people back there. Not yet. The notion that processing a document by page or bait stamping a document by page, that that's somehow a technological innovation or something that's unconventional, it beggars belief, right? I mean, the way that the legal field has processed documents for centuries has been on a quanta that makes sense for whatever you're doing. So if you're bait stamping a document, then naturally you stamp each page, right? We don't talk about bait stamping a paragraph. So this is a red herring. It's a token limitation. It was amended during prosecution to secure allowance. And the reason why that is important here is that all the rest of the claim limitations, including these very conventional ESI processing steps, were in the prior art. The limitation of – But in the prior art, did they actually divide this up this way? I mean, what happened is we went from my warehouse to just putting everything, everything into the computer, and then having to create search engines to figure out how to find what particular document you want or how to identify a particular document. Isn't this dividing here sort of an improvement upon that methodology? No, Your Honor. I respectfully disagree because this type of division into blocks was already being done both before the advent of computers to process what we now call ESI or electronically stored information, but even after the advent of the shift from paper to ESI, it was natural to deal with documents and pages on a basis that made sense. Wasn't there a factual dispute, though, about what the precursor ESI really was? I mean, should this have been decided on a motion to dismiss or should there have been at least some development of the record to make it clear what the methodology under the precursor ESI was? Your Honor, I don't think that there was any need to perform any fact-finding in this case and that it was appropriate for the district court to dismiss the case and find the patent ineligible because all the steps that are recited in Claim 1, the only independent claim of the patent, are so conventional and well-known. We hear those phrases from cases like Bilski, Mayo, and Alice, but this is one that's in our wheelhouse. This is a case about the processing of legal materials, depositions, documents, evidence, and so on, and what could be more routine and conventional than stamping a document page by page? Yet that is the slender reed that NextPoint relies upon and claims as an innovation. How is this different from the distributed architecture in Amdocs? It's completely different. I'm glad you asked the question, Your Honor, because unlike the Amdocs system that was claimed, where they actually had innovative concepts that were disclosed and claimed in the nature of actually detecting information throughout the network and where it was most timely to capture it without disrupting operation of the network, and then sent the material that was collected, the data, to a server for processing elsewhere. So Amdocs actually is about a patent that discloses the system in detail. Here, the specification is replete with references to you could use anything. So this is just like what the Supreme Court warned us about in Alice, that we have a wholly conventional and generic implementation on computers without anything specific being taught. That's a very example of something that is abstract and does not provide that inventive component necessary to save an otherwise abstract claim from being ineligible. Here, for example, on A61, column 7, line 17 to 22, it talks about the cloud computing network, and there's no disclosure in this patent anywhere about what they specifically do. So it is said in that passage that the cloud computing network is what will provision the virtual computers that will do the processing. There's actually nothing taught aside from generic components. And let's face it, cloud computing was not invented by Nextpoint. They don't claim that. It was already in use. We know that from the prosecution history because they had to amend to add the smallest block limitation to secure allowance. And so what we're left with is a completely conventional, and to lawyers and judges and legal staff, well-known process for receiving, storing, and processing ESI. And the only thing that Nextpoint can point to is that somehow there's something innovative in processing on a block basis. But the prior art, the spheres reference that they amended to distinguish, taught processing on a 512-byte block, as opposed to the smallest block according to whatever you're doing. But it's a tautology to say, well, if what you're doing is processing by page, then what you want to do is process by page. I mean, that's essentially what Nextpoint disclosed and claimed, and now suggested to this court that that is somehow an innovative concept that would rise to the level of, say, ENFISH with the self-referential tables as something that was unconventional, very different, and had advantages to it. And what's interesting here is that Nextpoint doesn't even tout any technical advantage to breaking the ESI down into the smallest block. It's not in their brief. They didn't argue it below, and you didn't hear that today. And the reason is that there is no advantage. So unlike the cases in which this court has found that a patent was eligible, despite being drawn to software implementation, here there's no technical innovation. Instead, the specification literally recites a smorgasbord of all the different types of computers, networks, cloud computing networks, upon which the invention could be practiced. That is exactly opposite from the MDOCS scenario. Can you just walk through what happened in the prosecution history? Yes, Your Honor. So there was a three-patent obviousness rejection, and the examiner found that the claim that issued claim one, it was actually added late after a request for continued examination. It was pending claim 28. And the examiner noted that those three references taught every element of the claim. And so the amendment was made to add the smallest block requirement because the examiner suggested this in an amendment, because Spears taught breaking down the ESI into 512-byte long blocks, so fixed blocks. And so because there was this disclosure at A61, column 7, lines 27 to 41, there was this disclosure about breaking down ESI according to what the processing was. So if you were processing by document, the smallest block would be a document. If you were processing a page, the smallest block would be a page. Again, I suggest that's tautological. But because that was a minor difference from Spears, the applicant agreed with the examiner, the amendment was entered, and the claims were allowed. So at no point, though, neither in the specification nor to the examiner, was there any suggestion that this was some revolutionary idea or something that was unconventional. That didn't even occur. Because, of course, even though the patent issued in 2013, so after the Mayo decision and after Bilski, we know that the PTO didn't really start instructing examiners what to do about Alice until after Alice. So this patent issued before that. It's interesting that the blue brief in this case devotes a page and a half to the second prong of Mayo and Alice. So that's where you would ordinarily expect there to be a lot of grist for the mill and a lot of information from the patentee pointing out all the many places in the specification that supports their contention that despite their claims being directed to an abstract idea, there's some technical innovation or something more, as the cases have referred to. But here they devote a page and a half to it, short shrift, and there's nothing cited from the specification. And the reason is that this invention, as taught, as the Supreme Court used the language in Alice, is a wholly generic implementation on a computer. There's nothing that is different from the scenarios in content extraction. In Judge Toronto, your authored opinion in Electric Power Group in August 2016, the case from this week, Intellectual Ventures versus Capital One, all of those cases are now following a very common groove. The recitation of very conventional steps that are then implemented on a generic computer or generic network or some combination thereof. And this case is just the latest in a long line of such cases, and there's nothing to distinguish it from all that have gone before. In fact, it's remarkably similar. And if you look at even the preamble of Claim 1 at issue here, the preamble is a method for collecting and managing trial information. So that is, I think, an illustrative place to start, that this is just like content extraction where we have a patent that discloses a way to receive, process, and store information. In that case, it was checks that were being scanned, and metadata from the checks, such as the routing transit number, the account number, were being scanned from the check and then stored apart from the check. This case is remarkably similar because one of the steps in Claim 1 is to extract metadata from whatever the ESI is. So if it's a deposition, we get to know who the deponent was, when it was taken, and so on. And so the steps in Claim 1 are completely conventional and familiar to us because they are simply, like all these other cases, processing information. Cases that now the Supreme Court is starting an analysis, and this court over and over have found to be abstract ideas. And so when this court turns to the second prong of the Mayo analysis test, you see that this disclosure is just like electric power group. It's just like in-ray TLI communications, in which there are nothing more than generic references to computing components. And here in the 731 patent, we see many suggestions that persons of skill and art already know about distributed processing, and those forms can be used. And it even says, even though the claim is directed to implementation in a cloud computing network, in Column 1, it actually says, you can even use the invention on a single computer. You don't even need a network. So this patent, from a technological standpoint, is completely agnostic about how it's implemented. That's very different from Amdocs. That's very different from EnFish and InRay Bascom, cases in which this court has found that there was some technological invention, something that was innovative that rescued what might have otherwise been an abstract idea. Thank you, counsel. Mr. Topic has a little rebuttal time. Thanks. Let me start with the bait-stamping hypothetical that counsel put forth. What he didn't include in that hypothetical was the notion that you would take all those pages and you would separate them out into individual pages, and you would have a team of people and you would constantly be handing out pages as soon as somebody's done. You wouldn't do that. You would take a whole document and you would bait-stamp the whole document. There's a difference between what's being processed and how the data is being divided in order to accomplish that. Can I just ask, can you address the use of the word comprises in this key step? I'll start by saying it's not an issue I really thought about. So are you talking about the preamble comprising the steps of? No, in the step that you identified as the key thing, the dividing step. Okay. Dividing the electronically stored information into a bunch of blocks, each of them comprises the smallest block of information to be processed at one time, depending on the type of processing. So even if the smallest block that you're going to bait-stamp is a page, that language would cover giving them the whole stack. Because it would comprise the page. Right. So I read comprises is basically meant to be is, which I understand is a little different from how you would use that in the preamble. In patents. In the preamble, at least. And I think that's potentially the claim construction issue of, does comprise meant to be limited to, could it include something larger? We've never argued that. In other words, it's the wrong term at that part of the claim. It may be, but there certainly have been examples where once you read it in context, you can see that that's not what was intended and that's not how one is skilled. And this topic that I just raised was not part of this argument. Correct. There's also been argument about this notion, oh, you could use anything. You could use any components. So part of that is not claimed, but it ignores the fact that whatever components you choose, and you could choose lots of different components, there's a specific process that's set forth as to how you use those components. And while a lot of the cases where you have found eligible subject matter, look at the novelty of the components within that architecture and whether that's a novel architecture, there is no reason to distinguish here where even if the architecture is somewhat flexible and isn't novel, how you actually perform those steps is novel. And that makes sense because otherwise software that runs on general purpose computers all the time, and just because it runs on a general purpose computer, doesn't mean that the steps themselves can't be novel. I'm out of time. I had one quick point I would make, but I'll stop. Make your quick point. There was a phrase in the Affinity Labs case that came out since the briefing. When talking about DDR, there's a difference between doing something to a web page and simply doing something on a web page. And I think that exactly reads on what's going on here. The claims are directed to how that software, how the system works. It's not simply using the system to accomplish some economic goal. Thank you. Thank you. You both have helped bring this case out of the cloud and down to earth. I'll take it under advisement. All rise.